**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MICHAEL EDGAR**,

                       **Plaintiff,**             **1:09-cv-700**
                                             **(GLS\DRH)**

           **v.**

**MVP HEALTH PLAN, INC.,** also known
as MVP Health Care, Inc.,

                       **Defendant.**
_____

**APPEARANCES:**              **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Lombardi, Reinhard Law Firm      PAUL E. DAVENPORT, ESQ.
Three Winners Circle
Albany, NY 12205

**FOR THE DEFENDANT:**
Greenberg, Traurig Law Firm      VICTORIA P. LANE, ESQ.
54 State Street, 6th Floor          JILL E. MCCOOK, ESQ.
Albany, NY 12207

**Gary L. Sharpe**
**District Court Judge**


**MEMORANDUM-DECISION AND ORDER**

**I. Introduction**

    Plaintiff Michael Edgar brought this action against defendant MVP

Health Plan, Inc. under § 502(a)(1)(B) of the Employment Retirement

Income Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B), seeking to recover medical fees incurred as a result of MVP's denial of benefits due under the health insurance services plan administered by MVP.  (*See* Compl., Dkt. No. 1.)  Pending are MVP's motion for summary judgment, (Dkt. No. 19), and Edgar's cross-motion for summary judgment, (Dkt. No. 23).  For the reasons that follow, MVP's motion is granted and Edgar's motion is denied.

## II. Background

### A.   Factual History

MVP Health Plan, Inc. is a New York State not-for-profit corporation that is authorized to issue health maintenance organization insurance products to groups and individuals within MVP's services area.  (*See* Def. SMF ¶ 1, Dkt. No. 19:1.)  In September 2007, Edgar Roofing/Sheet Metal and MVP entered into a New York State Health Insurance Contract (the Plan), which provides Edgar Roofing's eligible employees and their dependents with certain health care benefits.  (*See* Pieraccini Aff., Def. Ex. A at 1-87, Dkt. No. 19:4 (filed under seal).)  As a dependent of James Edgar, an Edgar Roofing employee, plaintiff Michael Edgar was an eligible beneficiary of the Plan.  (*See* Def. SMF ¶ 4, Dkt. No. 19:1.)  The Plan

2

constitutes an employee welfare benefit plan under ERISA as defined by 29 U.S.C. § 1002.  (*See id.* at ¶ 3.)

The Plan consists of the following documents: (1) the General Terms and Conditions; (2) the Certificate of Coverage; (3) the Mental Health Parity-Extended Benefits Rider; (4) the Contraceptive Drug & Devices Rider; (5) the Schedule of Benefits; (6) the Premium Rate Schedule; and (7) the Group Application.  (*See id.* at ¶ 5.)  The Certificate, as amended by the Mental Health Parity Rider and the Contraceptive Drug & Devices Rider, describes the health care services covered under the Plan and the terms and conditions according to which benefits for such services are provided.  (*See id.* at ¶ 6.)  The Certificate stipulates that MVP will provide benefits for services that are both "Covered," (*see* Pieraccini Aff., Def. Ex. A at 19, Dkt. No. 19:4), and "Medically Necessary," (*see id.* at 52). "Covered Services" are defined as "the health care services specified in th[e] Certificate as eligible for benefits."  (*Id.* at 21.)  According to the Certificate, services are "Medically Necessary" if (1) they are recommended by the beneficiary's treating professional provider; and (2) MVP's Medical Director or physician designee determines that they meet the following criteria:

    i.     the services are appropriate and consistent with the diagnosis and treatment of [the beneficiary's] medical condition;

    ii.    the services are not primarily for [the beneficiary's] convenience, the convenience of [his] family, or [his] provider;

    iii.   the services are required for the direct care and treatment or management of that condition;

    iv.   the services are provided in accordance with general standards of good medical practice, as evidenced by, reports in peer reviewed medical literature; reports and guidelines as published by nationally recognized health care organizations that include supporting scientific data; and other relevant information brought to [MVP's] attention; and

    v.    the services are rendered in the most efficient and economical way and at the most economical level of care, which can safely be provided to [the beneficiary].

(*Id.* at 52.)  By way of the Mental Health Parity Rider amendment, a sixth criterion requires that "the services are expected to provide significant, measurable clinical improvement within a reasonable and medically predictable period of time."  (*Id.* at 80.)

The Certificate generally states that "MVP will only provide benefits for Covered Services provided by an MVP Participating Provider."[1]  (*Id.* at 19.)  However, the Certificate outlines three 'exceptional circumstances' in

---

[1]"Participating Provider" is defined as "a Provider who has an agreement with MVP to provide Covered Services to [beneficiaries]." (Pieraccini Aff., Def. Ex. A at 23, Dkt. No. 19:4.)

4

which MVP will provide benefits for services provided by out-of-network

providers: (1) covered emergency care services;[2] (2) covered non-

emergency services where the "Covered Services" required are not

available through an MVP Participating Provider and where the beneficiary

receives prior written approval from MVP's Utilization Management

Department; and (3) covered preventive dental care services for children

that are provided by a licensed dentist.  (*See id.* at 19.)

In addition, and again by operation of the Mental Health Parity Rider,

the Plan amends the Inpatient and Outpatient Mental Health Care

Sections, (*see id.* at 35-36, 39-40), to include "Extended Mental Health

---

[2]The Certificate defines "Emergency Services" as "those Covered Hospital and Covered Pre-Hospital Emergency Medical Services provided to treat an Emergency Condition."  (Pieraccini Aff., Def. Ex. A at 22, Dkt. No. 19:4.)

An "Emergency Condition" is "a medical or behavioral condition, the onset of which is sudden, that manifests itself by symptoms of sufficient severity, including severe pain, that a prudent layperson, possessing an average knowledge of medicine and health, could reasonably expect the absence of immediate medical attention to result in:

    i.     placing the health of the afflicted person in serious jeopardy, or in the case of a behavioral condition placing the health of the person or others in serious jeopardy.

    ii.    serious impairment to the person's bodily functions.

    iii.   serious dysfunction of any bodily organ or part of the person.

    iv.   serious disfigurement of the person.

(*Id.*)

Care Benefits" as "Covered Services," (*see id.* at 80). Accordingly, MVP's

obligations are amended to include the provision of "Extended Benefits" for,

inter alia, "the diagnosis and treatment of ... biologically based mental

illness." (*Id.* at 80.) "Biologically based mental illness" is defined as "a

mental, nervous, or emotional condition that is caused by a biological

disorder of the brain and results in a clinically significant, psychological

syndrome or pattern that substantially limits the functioning of the person

with the illness," which includes "schizophrenic/psychotic disorders, major

depression, bipolar disorder, delusional disorder, panic disorders,

obsessive compulsive disorders, anorexia and bulimia." (*Id.*) While the

Certificate stipulates that "MVP will only provide benefits for inpatient

services provided at a Participating Hospital," and that MVP "will not

provide benefits for care in a residential treatment facility," (*id.* at 35), the

Mental Health Parity Rider defines "Mental Health Care" to encompass

"medically necessary care rendered by an eligible practitioner or approved

facility and which, in the opinion of MVP, is directed predominantly at

treatable behavioral manifestations of Mental, Nervous or Emotional

Disorders or Ailments." (*Id.* at 79.)

    In late 2007, Edgar began receiving psychiatric treatment at the

Dartmouth Hitchcock Medical Center in Hanover, New Hampshire.  (*See*
James Edgar Aff. ¶¶ 3-7, Dkt. No. 25.)  After receiving extensive treatment
at Hitchcock, including shock therapy, and finding no success, Edgar, while
in contact with MVP representatives and his treating psychiatrist and
therapist, began searching for a different treatment program.  (*See id.* at ¶¶
8-16.)  Edgar's family discovered the Menninger Clinic in Houston, Texas,
which had a seven-week in-patient program for young adults with mental
issues similar to Edgar's.  (*See id.* at ¶ 16.)

On February 26, 2008, Edgar's father contacted MVP seeking names
of residential mental health treatment facilities in New Hampshire.  (*See*
Pieraccini Aff., Def. Ex. A at 504, Dkt. No. 19:4.)  According to MVP, a
representative told Edgar's father that residential treatment is not covered
under the Plan, but that in-patient mental health treatment is covered
where it is medically necessary and managed.  (*See id.*)  The
representative's note parenthetically states that there are "[n]o day limits
due to parity rider for [Mental Health] - but medically managed based on
necessity."  (*Id.*)  However, according to Edgar's father, MVP informed him
that it "had no in-patient program [for Edgar] and that if he had another
'crisis' [he] should [be taken] to Catholic Hospital emergency room, where

they can admit him to the mental health ward." (James Edgar Aff. ¶ 13, Dkt. No. 25.)  In other words, "MVP told [Edgar's father] that was all they could do ... [and] never provided ... the names of any facility that was in network and could provide [Edgar] with treatment."  (*Id.* at ¶ 14.)  And according to Edgar's father, MVP "never told [him that Edgar] had no coverage [or] that in-patient services were available."  (*Id.*)  Also on February 26, Edgar's therapist contacted an MVP representative regarding whether Edgar had coverage to undergo treatment with the in-patient residential program at the Menninger Clinic.  (*See* Pieraccini Aff., Def. Ex. A at 502, Dkt. No. 19:4.)  The MVP representative allegedly told the therapist that Edgar "has no coverage for OON [out-of-network] or residential."  (*Id.*)  Thus, according to Edgar's father, MVP rejected the referral request.  (*See* James Edgar Aff. ¶ 17, Dkt. No. 25.)

On March 3, 2008, Edgar began his treatment at the Menninger Clinic.  (*See* Def. SMF ¶ 24, Dkt. No. 19:1.)  According to the admitting physician, Dr. Edward Poa, Edgar met "criteria for a subacute admission due to recurrent difficulties with depression, as well as suicidality that has not remitted with outpatient treatment, inpatient treatment, and ETC [electroconvulsive therapy]."  (Pieraccini Aff., Def. Ex. A at 132, Dkt. No.

19:4; *see also id.* at 134 (making initial diagnosis of "Major Depressive Disorder, recurrent and severe without psychotic features").)  In his "Safety Assessment," Dr. Poa noted that Edgar "denies any recurring suicide attempts, but does describe ongoing suicidal ideation that is chronic and intense at times.  However, he currently denies any attempt or plan and describes having some hope in being here in treatment." (*Id.* at 132.)  Dr. Poa additionally noted that Edgar "denies any intent or plans to commit suicide at this time ... [and t]here is no evidence of psychotic symptoms, paranoia, or delusional thought." (*Id.* at 133.)  Between March 27 and April 11, Edgar underwent a series of psychological tests with Dr. Flynn O'Malley, who reported thereafter that Edgar's "suicidal ideation is seen as a chronic condition, but at the time of testing there was no evidence current preoccupation with suicide or death," and that Edgar "should be considered as vulnerable to suicidal states but not currently at serious risk." (*Id.* at 155.)  Dr. O'Malley further noted that Edgar "can certainly benefit from individual psychotherapy and medication management, but would also most clearly profit from treatment where he can have interactions with groups of peers over an extended period of time with focus on developing more social confidence." (*Id.* at 156.)

On April 21, 2008, Edgar was discharged from the Menninger Clinic. (*See* Def. SMF ¶¶ 36-37, Dkt. No. 19:1; *see also* James Edgar Aff. ¶¶ 17-18, Dkt. No. 25; Michael Edgar Aff., Dkt. No. 26.)  In his "Psychiatric Discharge Summary," Dr. Poa first noted that a physical exam conducted by Dr. Bettina Cardus "revealed [Edgar] to be a physically stable young male." (*See* Pieraccini Aff., Def. Ex. A at 129, Dkt. No. 19:4.)  In his assessment of Edgar's condition upon discharge, Dr. Poa described how Edgar's "mood and affect did improve greatly over the course of the stay, and he appeared to gain significant benefit from individual and group psychotherapies." (*Id.*)  According to Dr. Poa, "[o]ver the course of the stay, there were no acute safety issues.  [Edgar] did struggle with some thoughts of suicide early in the treatment ... but was able to use the staff support to get through these episodes." (*Id.*)  Dr. Poa concluded that "therapeutic work ... has led to large gains in mood and affect, ... [and that Edgar's] prognosis is fair at this time, though it is important that he continue treatment given his past suicidality." (*Id.* at 129-30.)

On April 14, 2008, MVP received a claim from the Menninger Clinic requesting payment for Edgar's in-patient stay during the period of March 3 to March 31, 2008.  (*See id.* at 94.)  This claim was followed up by

additional claims submitted by the Menninger Clinic on April 29 and May

16, 2008, regarding the remainder of Edgar's stay from April 1 to April 21,

2008.  (*See id.*)  By letter dated April 15, 2008, MVP denied the initial claim

pending MVP's review of the hospital and medical records.  (*See id.* at

125.)  In May 2008, MVP case manager Kelly Keohan and Senior Medical

Director Dr. Bernard Engleberg each reviewed Edgar's claim and noted

their findings.  (*See id.* at 94-95, 519-20.)  On May 30, Dr. Engleberg

denied Edgar's claim based on the following rationale:

> Medically denied for acute out of network services due to
> [Edgar] not having an out of network benefit and the availability
> of clinically appropriate in-network services.  [Edgar] was at no
> time acute or in any danger and, apparently, went specifically
> out of network to be treated at Menninger Clinic.
>       It appears that [Edgar] was at a baseline level of
> functioning when he went to the Menninger Clinic.  He was
> described as he "currently denies any attempt or plan" for
> suicide.  The only time that he "struggled with thoughts of
> suicide["] (without any plan or intent at all) was "early in
> treatment when confronted with interpersonal issues but was
> able to use staff support to get through these episodes....  Even
> after his 49-day treatment it was stated that "the patient's status
> at discharge was fair."
>       It was also clearly stated that "over the course of the stay,
> there were no acute safety issues."

(*Id.* at 95.)  On June 4, 2008, MVP notified Edgar that his claim was

denied.  (*See id.* at 97.)  Specifically, MVP informed Edgar that its denial

was "due to [Edgar] not having an out of network benefit and the availability

of clinically appropriate in-network services." (*Id.* at 98.)  The notification

further stated that "MVP has denied payment because the services are not

Medically Necessary.  Please refer to Mental Health Parity Amendment,

paragraph 2." (*Id.* at 97.)  In closing, the notification advised Edgar of his

right to appeal MVP's decision.  (*See id.* at 98.)

On November 26, 2008, Edgar appealed MVP's decision.  (*See id.* at

495-96.)  MVP Behavioral Health Medical Director Dr. Paul Schefflein

reviewed Edgar's appeal and upheld the denial of his claim.  (*See id.* at

532.)  And by letter dated December 19, 2008, MVP notified Edgar that the

denial was being upheld on the basis of Dr. Schefflein's findings that Edgar

"was not at risk to himself or others and when he left the symptoms were

described as [A]xis 2, the notes reflect that after 49-days [sic] he was fair

upon discharge.  Also, the policy in which [Edgar] is enrolled does not

cover non-participating providers when there are participating providers

available to meet his needs." (*Id.* at 534-35.)

**B.   Procedural History**

On June 18, 2009, Edgar filed the instant action against MVP,

seeking to recover $53,850.00 in medical fees incurred as a result of

MVP's denial of benefits.[3]  (*See* Compl., Dkt. No. 1.)  On September 1,

2010, MVP moved for summary judgment, (Dkt. No. 19), and, shortly

thereafter, Edgar cross-moved for summary judgment,[4] (Dkt. No. 23).

### III.  Standard of Review

The standard for the grant of summary judgment is well established

and will not be repeated here.  For a full discussion of the standard, the

court refers the parties to its previous opinion in *Bain v. Town of Argyle*,

499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

---

[3]Edgar additionally seeks to recover interest from June 23, 2008, and attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g).  (*See* Compl. at 5, Dkt. No. 1.)

[4]Among Edgar's arguments is that MVP was obligated to plead its reasons for denial as affirmative defenses, and that its failure to do so should operate to bar it from presenting those reasons here.  (*See* Pl. Resp. Mem. of Law at 14, Dkt. No. 24.)  The court declines to impose such a bar, since the "medically necessary" and "covered" requirements are central to "the existence or nonexistence of coverage," and because MVP expressly relied on these requirements in denying coverage of Edgar's claim.  *Juliano v. Health Maint. Org. of N.J., Inc.*, 221 F.3d 279, 288 (2d Cir. 2000) (holding that doctrine of waiver does not apply to the "medical necessity" requirement since "medical necessity" goes to "the existence or nonexistence of coverage" (internal quotation marks and citation omitted)); *see also Lauder v. First Unum Life Ins. Co.*, 284 F.3d 375, 382 (2d Cir. 2002) ("[T]o deem the defense of medical necessity to be waived, and thereby allow the [plaintiff] to recover without proving an essential element of [his] claim under the policy, would improperly expand the coverage of that policy.").

13

## IV.  **Discussion**

"A denial of benefits challenged under ERISA § 502(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 622 (2d Cir. 2008) (internal quotation marks, citation, and italics omitted).  "Where such discretionary authority is reserved, denials may be overturned as arbitrary and capricious only if the decision is without reason, unsupported by substantial evidence[,] or erroneous as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002) (internal quotation marks and citation omitted). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (internal quotation marks and citation omitted).  "The plan administrator bears the burden of proving that the arbitrary and capricious standard of review applies ...." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999) (citation omitted).  "Ambiguities are

14

construed in favor of the plan beneficiary." *Krauss*, 517 F.3d at 622

(citation omitted).

Under the arbitrary and capricious standard of review, which both

parties agree applies here, MVP's denial of Edgar's claim must be affirmed.

Though sympathetic to Edgar's situation—since the record suggests that

the care Edgar needed may not have been available within the MVP

network, and that, even if it was, MVP was not particularly helpful in

locating and identifying such care—the court finds that the denial was both

supported by substantial evidence and reasonable.

First, substantial evidence supports the conclusion that the services

provided to Edgar by the Menninger Clinic were not "medically necessary."

Specifically, while it is unclear whether Edgar's treating professional

provider recommended placement at the Menninger Clinic, MVP itself

could reasonably have concluded—as it did—that the services were not

"rendered in the most efficient and economical way and at the most

economical level of care, which can safely be provided," and that the

services could not be "expected to provide significant, measurable clinical

improvement within a reasonable and medically predictable period of

time."[5]  (Pieraccini Aff., Def. Ex. A at 79-80, Dkt. No. 19:4; *see also*

Schefflein Aff. ¶¶ 9-12, Dkt. No. 19:5 (filed under seal) (describing the basis

for and steps followed in making the decision that Edgar's treatment was

not medically necessary, which included findings that the Menninger

Clinic's services "were not expected to provide significant, measurable

improvement of Edgar's condition within a reasonable and medically

predictable period of time," and that "Edgar could be safely treated at a less

restrictive level of care in the network").)  Accordingly, the court cannot

conclude that MVP's finding that the services provided by the Menninger

Clinic were "not Medically Necessary" was without reason, unsupported by

substantial evidence, or legally erroneous  (*Id.* at 97.)

       Second, even if Edgar could establish that MVP arbitrarily found that

_____

       [5]Edgar argues that, in evaluating the "medical necessity" of his
treatment, MVP limited itself to the five criteria outlined in the Certificate
without considering the additional sixth criterion under the Mental Health
Parity Rider.  (*See* Pl. Resp. Mem. of Law at 12-13, Dkt. No. 24.)  This
argument must be rejected for two reasons.  First, it is
inconsequential—factually at least—whether MVP applied one standard or
the other.  The first five criteria are the same under both the Certificate
and the Rider, and the sixth criterion actually renders the Mental Health
Parity Rider standard more exacting, since all criteria must be met for
coverage to arise.  Second, the record contains evidence, including the
June 4, 2008 disclaimer letter, establishing that MVP did in fact evaluate
Edgar's claim under the Mental Health Parity Rider standard.  (*See*
Pieraccini Aff., Def. Ex. A at 97, Dkt. No. 19:4.)

his treatment was not "medically necessary," the record contains substantial evidence supporting MVP's finding that the Menninger Clinic services were not "covered" as they did not qualify for either of the potentially relevant out-of-network exceptions.  Notwithstanding the seriousness of Edgar's condition, there is substantial evidence demonstrating that his condition did not present an emergency as defined by the Plan, which requires, inter alia, a sudden onset, symptoms of sufficient severity, and the specter of serious jeopardy.  (*See id.* at 22; *see, e.g.*, *id.* at 95, 98, 534-35 (noting that Edgar's condition was "at no time acute"; that Edgar "was at a baseline level of functioning when he went to the Menninger Clinic" and "was described as ... currently den[ying] any attempt or plan for suicide"; and that Edgar "was not at risk to himself or others" (internal quotation marks omitted)).)  As to the second exception for covered non-emergency services, there is no dispute that Edgar did not obtain prior written approval from MVP—probably because MVP representatives had already told him that his treatment at the Menninger Clinic would not be covered.  Thus, while the evidence available on record suggests that the treatment Edgar was seeking was *not* available in MVP's

17

network,[6] it is clear that Edgar did not satisfy the preconditions for out-of-network coverage and that MVP reasonably exercised its discretion in determining that the Plan did not cover services received from the Menninger Clinic.

Third, while the Mental Health Parity Rider provides "Extended Benefits" for mental health treatment—which also requires a threshold finding of "medical necessity"—the record fails to support Edgar's contention that the Menninger Clinic qualified as "an eligible practitioner or approved facility." (*Id.* at 79.) Nor does the court find any support in the record or the Plan itself for Edgar's argument that the Mental Health Parity

---

[6]To the extent that MVP's denial of coverage was based in part on "the availability of clinically appropriate in-network services," (Pieraccini Aff., Def. Ex. A at 98, Dkt. No. 19:4), the record does not support such an assertion. Rather, the evidence submitted by both Edgar and MVP at best raises a question of fact as to whether appropriate treatment was actually available within the MVP network. However, the unavailability of in-network treatment would not alter the court's overall finding that MVP's denial of coverage was supported by substantial evidence. Still, the court looks with skepticism upon this aspect of MVP's denial of coverage.

In addition, the court is equally skeptical of MVP, Dr. Engleberg, and Dr. Schefflein's reliance on treatment notes that relate to Edgar's status when he was discharged from the Menninger Clinic. The court is hard pressed to imagine how Edgar's status at discharge is relevant to the medical necessity of his admission to the Menninger Clinic. Such reliance is even more questionable since the Menninger Clinic notes largely indicate that Edgar's status actually improved during, and presumably as a result of, his treatment.

Rider creates an exception to or otherwise voids the Plan's preclusion of coverage for "care in a residential treatment facility."  (*Id.* at 35.)

Lastly, having reviewed the steps taken and reasons given by MVP in denying coverage, the court finds that MVP complied with its obligations and duties under ERISA, including any implicit duty of good faith and fair dealing.[7]  *Compare Shutts v. First Unum Life Ins. Co.*, 310 F. Supp. 2d 489, 500 (N.D.N.Y. 2004) (recognizing that a duty of good faith and fair dealing is implicit in any ERISA plan), *with Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 113-14 (2d Cir. 2008) (finding state law claim for breach of the covenant of good faith and fair dealing preempted by ERISA because the claim "relates to" and would require reference to the Plan), *and Thompson v. Gen. Elec. Co.*, No. 01 Civ. 4438, 2002 WL 482862, at *6 (S.D.N.Y. Mar. 29, 2002) (finding breach of covenant of good faith and fair dealing "completely coextensive" with and therefore preempted by ERISA claim where both claims rest on the alleged wrongful denial of benefits). Aside from his conclusory allegations, Edgar has failed to submit any evidence demonstrating that MVP failed to reasonably review his claim or

---

[7]The complaint does not refer to or allege a violation of the duty of good faith and fair dealing.  Still, Edgar does allege that MVP, by denying his claim, violated its fiduciary duties.  (*See* Compl. ¶ 24, Dkt. No. 1.)

otherwise acted in bad faith.  Nor has Edgar offered any non-circumstantial

evidence that MVP's potential conflict of interest as both the evaluator of

and payer on claims actually influenced its decision to deny Edgar's claim.[8]

*See Hobson v. Metro Life Ins. Co.*, 574 F.3d 75, 83 (2d Cir. 2009) ("[T]he

deference to be given to the administrator doesn't change unless the

plaintiff shows that the administrator was, in fact, influenced by the conflict

of interest." (internal quotation marks and citation omitted)).  And as the

court has already found, MVP's basis for denial was sufficiently

reasonable.

## V.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that MVP's motion for summary judgment (Dkt. No. 19) is

**GRANTED** and Edgar's complaint is **DISMISSED**; and it is further

**ORDERED** that Michael Edgar's motion for summary judgment (Dkt.

No. 23) is **DENIED**; and it is further

_____

[8]Without evaluating the actual effectiveness of the policies and procedures MVP has in place to promote accuracy and mitigate conflicts of interest, the court does credit MVP Assistant Counsel Alisha Pieraccini's averments regarding the existence, employment, and operation of such policies and procedures.  (*See* Pieraccini Reply Aff. ¶¶ 9-17 and Ex. C, Dkt. No. 30:2.)

**ORDERED** that the Clerk close this case and provide a copy of this

Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

May 6, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge